Filed 12/10/18

CERTIFIED FOR PUBLICATION


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION TWO


| | |
|---|---|
| J.W., a Minor, etc., | |
| Plaintiff and Respondent, | E066555 |
| v. | (Super.Ct.No. MCC1300850) |
| WATCHTOWER BIBLE AND TRACT SOCIETY OF NEW YORK, INC., | OPINION |
| Defendant and Appellant. | |


APPEAL from the Superior Court of Riverside County. Thomas A. Peterson (retired judge of the Los Angeles Super. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.); David E. Gregory, temporary judge (pursuant to Cal. Const., art. VI, § 21); and Raquel A. Marquez, Judges. Affirmed.

Joel M. Taylor; Morris Polich & Purdy, Richard H. Nakamura, Jr., Beth A. Kahn, Dean A. Olson and Ryan C. McKim for Defendant and Appellant.

The Zalkin Law Firm, Irwin M. Zalkin, Devin M. Storey; Pine Pine Freeman Tillett, Norman Pine and Scott Tillet for Plaintiff and Respondent.

Plaintiff and respondent J.W., through her guardian ad litem, sued defendant and appellant Watchtower Bible and Tract Society of New York, Inc. (Watchtower) and others for (1) negligence; (2) negligent supervision/failure to warn; (3) negligent hiring/retention; (4) negligent failure to warn, train, or educate J.W.; (5) sexual battery; and (6) intentional infliction of emotional distress. In January 2014, J.W. filed a motion to compel further discovery responses. On February 11, the trial court granted the motion in part. The trial court's order compelled Watchtower to produce all documents Watchtower received in response to a letter sent by Watchtower to Jehovah's Witness congregations on March 14, 1997, concerning known molesters in the church (1997 Documents).

By November 2014, Watchtower had not produced the 1997 Documents, and J.W. moved for terminating sanctions. At a hearing on the sanctions motion, the trial court offered Watchtower four days to produce the 1997 Documents. Watchtower declined the offer and refused to produce the 1997 Documents. The trial court granted the motion for terminating sanctions and struck Watchtower's answer. The trial court clerk entered Watchtower's default. After considering evidence, the trial court entered judgment in favor of J.W. and awarded her $4,016,152.39.

On appeal, Watchtower raises four issues. First, Watchtower contends J.W. failed to allege proximate cause in her first amended complaint (FAC). Second, Watchtower asserts its right of due process was violated. Third, Watchtower contends terminating sanctions were excessive because lesser sanctions may have been effective.

2

Fourth, Watchtower contends the trial court erred by denying Watchtower's motion for relief from the terminating sanctions. We affirm the judgment.

## FACTUAL AND PROCEDURAL HISTORY

A.     <u>FAC</u>

The facts in this subsection are taken from J.W.'s FAC. Watchtower "organized, administered and directed the congregational affairs of Jehovah's Witnesses in the United States." "The organizational structure of the Jehovah's Witness Church is hierarchical in nature. The organizational head of the Religion is the Watchtower. Authority flows downward from Watchtower to the local level of the Church, which is made up of congregations. [¶] Watchtower is the head of the Jehovah's Witness Hierarchical structure. Watchtower is directed by a Governing Body, which is comprised of a fluctuating number of Elders." "Watchtower establishes processes for the discipline of members accused of wrongdoing, and receives and keeps records of determinations of disfellowship, or of reproval of individuals appointed by Watchtower and Ministerial Servants or Elders."

In the hierarchical structure, the level below Watchtower is the circuit. "Circuits are generally comprised of 20 to 22 Congregations." The next level down consists of the local congregations, which are managed by a body of elders. "Elders are the highest authority at the congregational level and direct door to door preaching activities, select potential candidates for becoming Ministerial Servants and Elders, organize weekly church meetings, determine whether an individual is suitable for representing the church in the community by becoming a Publisher, handle finances for the local church, and

3

determine the guilt, repentance and punishment of church members who commit serious sins.

"To be appointed as an Elder, a person must be a Ministerial Servant in good standing, or have served as an Elder in another congregation. The Body of Elders of the local church identifies potential candidates and determines whether they are suitable, and if they live their life in accordance with appropriate morals. Once a candidate has been identified by the local church, a recommendation is made to Watchtower, or later, CCJW (Christian Congregation of Jehovah's Witnesses, Inc.), who have the ultimate authority as to whether a candidate is approved and becomes an Elder."

"Congregants are encouraged to bring problems to the Elders to be resolved rather than to seek intervention from outside of the Jehovah's Witness faith. In practice, when a Congregant commits an act of wrongdoing, such as the sexual abuse of a child, that matter may be brought to an Elder to be resolved." If the alleged perpetrator confesses, or if there are two witnesses to the alleged wrongdoing, then a judicial committee will be convened.

J.W. is a female. J.W. was born in 1997. J.W. was raised as a Jehovah's Witness. In July 2006, J.W. and Gilbert Simental[1] belonged to the Mountain View Congregation of Jehovah's Witnesses. Prior to July 2006, at a different congregation, Simental served as a ministerial servant and as an elder. Upon joining the Mountain

---

[1] J.W. spelled Simental's name as Simentel. We use the spelling from Simental's criminal case: *People v. Simental* (August 10, 2009, E046303) [nonpublished opinion] [2009 Cal. App. Unpub. LEXIS 6407].

4

View congregation, Simental served as an elder. Simental's position as an elder created access to J.W.

"On July 15, 2006, [J.W.] and three other girls were invited to a slumber party at [Simental's] home. [Simental] had a daughter near the age of [J.W.] and the other invited girls. [¶] During that afternoon, [Simental] joined the girls in a pool in the backyard. While in the pool, [Simental] sexually molested [J.W.] and another girl (Doe 1) in separate incidents. Doe 1's sister, Doe 2, had previously been molested on two occasions by [Simental]."

Doe 1 and Doe 2 told their mother about Simental molesting them. The mother contacted an elder of the congregation, and a judicial committee was convened. Simental admitted he molested Doe 2 on two occasions, and that he molested Doe 1 twice on July 15. The judicial committee reproved Simental.

The principal of Doe 1 and Doe 2's school was notified of the abuse, and s/he reported it to law enforcement. Approximately two months after July 15, J.W.'s parents received a telephone call from the Murrieta Police Department asking if Simental sexually abused J.W. J.W.'s father (Father) spoke to the elders of the Mountain View congregation who advised Father that J.W. did not have to speak with the police.

J.W. and her family began attending a different congregation—the French Valley Congregation of Jehovah's Witnesses. Unbeknownst to J.W. and her family, Simental also moved to the French Valley congregation. Approximately one year after July 2006, J.W. informed her parents of the extent of Simental's sexual touching. J.W.'s parents spoke to the police and then to the elders of the French Valley congregation.

5

The elders came to J.W.'s home and "interrogated JW, who was approximately ten years of age, about the abuse in explicit detail. JW, and her parents, were very upset by the explicit nature of the questions asked, and the depth to which the Elders probed for information."

Father told the elders that he was thinking of requesting a restraining order against Simental. The elders told Father that he did not need to speak to the police, "and that to do so would bring reproach on the congregation." In two criminal cases, Simental was found guilty of molesting Doe 1, Doe 2, and J.W.[2]

J.W.'s first cause of action was for negligence. J.W. asserted Watchtower had a duty to protect J.W., who was entrusted to Watchtower's care by J.W.'s parents. J.W. asserted Watchtower had a duty to control Simental and prevent him from sexually molesting children. J.W. alleged that Watchtower was "aware, prior to the sexual abuse of [J.W.] herein, of [Simental's] dangerous and exploitive propensies. [Watchtower was] also aware that [it] had the ability to place restrictions on [Simental's] access to children, service and preaching activities, give warnings to the congregation, and otherwise control Simental's conduct."

Further, J.W. alleged Watchtower had a duty to investigate Simental and to not employ Simental as a ministerial servant or elder. J.W. asserted Watchtower knew Simental "was likely to harm others in light of the work entrusted to him." J.W.

---

[2] The criminal appellate case concerning Doe 1 and Doe 2 is *People v. Simental* (August 10, 2009, E046303) [nonpublished opinion] [2009 Cal. App. Unpub. LEXIS 6407].

6

alleged, Watchtower "knew or reasonably should have known of [Simental's] dangerous and exploitive propensities and/or that [Simental] was an unfit agent. It was foreseeable that if [Watchtower] did not adequately exercise or provide the duty of care owed to children in their care, including but not limited to [J.W.], the children entrusted to [Watchtower's] care would be vulnerable to sexual abuse by [Simental]."

J.W.'s second cause of action was for negligent supervision/failure to warn. J.W. alleged Watchtower had a duty to provide reasonable supervision of Simental, to use reasonable care in investigating Simental, and to provide adequate warning to J.W. and her family of Simental's dangerous propensities. J.W. further alleged that Watchtower knew or reasonably should have known of Simental's dangerous or exploitive propensities, and despite such knowledge failed to adequately supervise Simental. J.W. asserted Simental's position as an elder allowed him to gain access to J.W.

J.W.'s third cause of action was for negligent hiring/retention. J.W. asserted Watchtower knew or should have known of Simental's dangerous or exploitive propensities, and therefore had a duty not to hire or retain Simental as a ministerial servant or elder. J.W.'s fourth cause of action was for negligent failure to warn, train, or educate J.W. J.W. asserted Watchtower had a duty to protect her from sexual abuse by Simental.

J.W.'s fifth cause of action was for sexual battery. J.W. asserted Simental was aided in molesting J.W. "by his status as an agent of . . . Watchtower . . . . Without his position as a . . . Ministerial Servant and/or Elder, [Simental] could not have accomplished the harmful and offensive touching of [J.W.]" J.W.'s sixth cause of

7

action was for intentional infliction of emotional distress. J.W. alleged Watchtower's conduct was extreme and outrageous and done in an intentional or reckless manner.

In J.W.'s prayer for relief she wrote, "[J.W.] prays for damages; punitive damages against Defendant Mountain View [Congregation of Jehovah's Witnesses, Murrieta, California]; costs; interest; statutory/civil penalties, according to law; and such other relief as the court deems appropriate and just."

B.     ANSWER

Watchtower filed an answer. Watchtower alleged, what it labeled as, 12 affirmative defenses. The third affirmative defense alleged a failure to state a claim, the ninth affirmative defense alleged Watchtower did not owe a duty to J.W., and the eleventh affirmative defense alleged a lack of proximate cause.

C.     MOTION TO COMPEL THE PRODUCTION OF DOCUMENTS

1.     *MOTION*

J.W. filed a motion to compel further responses to a request for the production of documents. J.W. asserted she requested Watchtower produce various documents, and Watchtower refused citing the clergy-penitent privilege. Request for production No. 66 (RFP 66) provided, "ALL DOCUMENTS received by YOU in response to the Body of Elders letter dated March 14, 1997." In her motion to compel, J.W. explained, "On March 14, 1997, Watchtower addressed a letter to All Bodies of Elders, which required all Congregations to check their files and respond in writing to the Service Department explaining all occasions when a person who was known to have molested a child was

promoted to a responsible position in the Congregation, including positions as an Elder or Ministerial Servant, among others."

J.W. argued, "Any information received by Watchtower in response to this letter . . . is relevant to understanding the formation of organizational policy regarding childhood sexual abuse, and is also relevant toward establishing the level of institutional knowledge of [Watchtower] regarding childhood sexual abuse, which is relevant in establishing the reasonableness of organizational policy, efforts to educate members, supervision of [J.W.] and Simental, and other considerations concerning duty and breach. Also, [J.W.] has alleged a claim for punitive damages against Defendant Mountain View, and will consider amending to allege a claim for punitive damages against the other Defendants. [S]uch information is relevant to a punitive damage[s] claim."

J.W. asserted the clergy-penitent privilege was not applicable because the responses to the March 14, 1997, letter were made with the understanding that they would be shared with others. J.W. requested sanctions be imposed in the amount of $1,680.

### 2. *J.W.'S SEPARATE STATEMENT*

Watchtower objected to RFP 66 based upon (1) the minister-communicant privilege; (2) invasion of privacy; (3) the request not leading to admissible evidence; and (4) the request being overbroad. Further, Watchtower responded that it did not have any documents predating July 15, 2006, concerning Simental, which were sent in response to the March 14, 1997, letter.

9

J.W. argued that any information received by Watchtower in response to the March 14, 1997, letter would be relevant to understanding Watchtower's "organizational policy regarding childhood sexual abuse," as well as understanding Watchtower's "level of institutional knowledge . . . regarding childhood sexual abuse." J.W. asserted evidence of Watchtower's knowledge would be relevant to proving duty and breach, as well as a possible future claim for punitive damages.

3.    *OPPOSITION*

Watchtower opposed J.W.'s motion to compel, arguing, "Watchtower produced a 'Privilege Log,' which identified fifteen (15) items constituting all the records responsive to [J.W.'s] search. Watchtower contends that [J.W.]'s request unreasonably exceeds the proper scope of discovery and that court ordered production of any of the records would constitute an unnecessary, unconstitutional, interference with the internal governance of a church." The privilege log related to J.W.'s request for production No. 2.

Further, Watchtower asserted the slumber party, at which J.W. was molested, was not a church sponsored event. Watchtower contended Simental was a regular congregation member in July 2006; he was not an elder. Watchtower contended it did not have any records indicating Watchtower knew, prior to July 2006, that Simental posed a risk of harm to children.

In a declaration by Watchtower's Associate General Counsel, Mario F. Moreno, he asserted attorney-client privilege applied to various documents requested by J.W.

10

Moreno specifically identified various documents and explained why the attorney-client privilege should be applied. Moreno did not specifically identify the 1997 Documents.

### 4. *RESPONSE*

J.W. responded to Watchtower's opposition. J.W. asserted Watchtower failed to address the portion of her motion to compel related to the 1997 Documents. J.W. contended that Watchtower's failure to oppose that portion of her motion should be treated as a concession.

### 5. *HEARING*

On February 11, 2014, the trial court, in particular Judge Peterson, held a hearing on J.W.'s motion to compel. The trial court denied J.W.'s motion in relation to specific documents that were identified as protected by the attorney-client privilege. As to all other documents/requests, the trial court granted J.W.'s motion. The minute order from the hearing reads, "Motion is granted and denied in part [¶] ruling as stated on the record." (All caps. omitted.)

### D. MOTION TO SET ASIDE

### 1. *MOTION*

Watchtower filed a motion to set aside the trial court's order compelling Watchtower to produce the 1997 Documents, or, in the alternative to issue a protective order. Watchtower asserted, "This particular aspect of the Court's order, however, was entered without opposing argument by Watchtower as a result of [the] mistake and excusable neglect of Watchtower's counsel Calvin Rouse and Rocky Copley." Watchtower asserted it objected to RFP 66, but did not address RFP 66 in its opposition

11

to the motion to compel because it did not understand that the motion included RFP 66. Watchtower asserted its confusion was due to (1) four separate motions having been filed, and (2) the motion to compel focusing primarily on issues other than RFP 66.

Watchtower requested leave to file an amended opposition. Watchtower asserted RFP 66 was overbroad; the 1997 Documents were protected by attorney-client privilege; and that it would take approximately 19 years to go through the 14,000 congregation files to produce the 1997 Documents.

### 2. *OPPOSITION*

J.W. opposed Watchtower's motion to set aside the order compelling production of the 1997 Documents. J.W. asserted Watchtower could not have been confused about RFP 66 being part of the motion to compel because a section of the motion expressly discussed the 1997 Documents, and a section of J.W.'s reply specifically discussed Watchtower's failure to address RFP 66 in its opposition. Thus, J.W. reasoned that RFP 66 was explicitly mentioned as part of the motion, and, therefore, it was not an excusable mistake that Watchtower failed to oppose the motion to compel as it related to RFP 66.

In regard to the production of the 1997 Documents being too burdensome, J.W. asserted Watchtower's person most knowledgeable testified that the records had been scanned into a computer system and that the text was searchable. J.W. asserted it was not an undue burden to search a computer system. As to the alternative request for a protective order, J.W. asserted Watchtower's request was too late and lacked merit. J.W. requested sanctions be imposed in the amount of $6,480.

12

### 3. *RESPONSE*

Watchtower responded to J.W.'s opposition. Watchtower conceded that RFP 66 was part of J.W.'s motion to compel, but asserted it was its attorneys' excusable neglect that caused Watchtower's failure to oppose that portion of the motion. Watchtower contended (1) it objected to RFP 66, and, thus, there was no explanation, other than oversight, for counsel's failure to oppose RFP 66 within the motion to compel; (2) counsel was working on four separate motions to compel; and (3) the motions were confusing to the trial court and J.W.'s counsel as well.

Watchtower conceded the files were electronic, but that an elder would still need "to review more than 14,000 congregations' files to determine if the hundreds of pages in each file were relevant. . . . That is because the sin of child abuse is often time described by elders who write to the Service Department by the Scriptural description of the specific sinful act, such as 'porneia', 'fornication', 'loose conduct', or 'uncleanness.' A search of the term 'child abuse' would not produce the documents requested." Watchtower contended the search would be further complicated by different states' definitions of child abuse because what is identified as child abuse in one state may not qualify as child abuse in California. Watchtower asserted its request for a protective order was timely. Watchtower requested the trial court deny J.W.'s request for sanctions.

### 4. *REPLY*

J.W. filed a reply. J.W. asserted expert testimony reflected it " 'could take as little as two days and as long as two months' " to retrieve the 1997 Documents. The

expert explained that finding the documents did not need to be complicated, although one could make it complicated. For example, one could use a search tool already provided by Microsoft, or one could program a new search tool.

### 5. *HEARING*

On May 9, 2014, the trial court, specifically Commissioner Gregory, held a hearing on Watchtower's motion to set aside the February 11 order. The trial court said Watchtower asserted clergy-penitent privilege in opposition to the motion to compel as it concerned RFP 66. The court said, "That argument was presented before the Court. Whether it was adequately argued to the satisfaction of defense counsel, it's not to be revisited at this time. It was argued, it must have been rejected. And at this point, I see no reason to further consider the—the correctness of the Court's order ordering further responses to the request for production of Document Number 66."

In regard to the production of the 1997 Documents being too burdensome, the trial court said "those are issues that well could, and more importantly, should have been raised much, much earlier than today." The trial court found the request for a protective order to be untimely. The trial court took the motion to set aside under submission.

### 6. *RULING*

On May 13, the trial court denied Watchtower's motion to set aside the order compelling production of the 1997 Documents. The trial court wrote that Watchtower "shall provide a full and complete response without objection or claim of privilege, and

shall further produce, all documents responsive to [J.W.]'s request for production, number 66, within 30 days." The trial court denied J.W.'s request for sanctions.

On June 23, the trial court issued an order that was specific to RFP 66. The trial court specifically denied Watchtower's request to set aside the order compelling a further response to RFP 66. The trial court denied J.W.'s request for sanctions, finding that Watchtower acted with substantial justification in bringing the motion to set aside.

### 7. *WRIT PETITION*

Watchtower petitioned this court for a writ of mandate. (*Watchtower Bible and Tract Society of New York, Inc. v. Superior Court* (E061557) [order denying, Aug. 1, 2014].) Watchtower asserted the 1997 Documents fell within the clergy-penitent privilege; the trial court violated the Establishment Clause and Free Exercise Clause of the United States Constitution; the trial court's order violated the privacy rights of third parties; and the trial court's order was unduly burdensome.

On July 23, 2014, this court issued a stay of the document production. On August 1, this court dissolved the stay and denied the writ petition. This court's order provided, "First, petitioner's request for a 'protective order' was in fact a disguised motion for reconsideration made with no attempt to comply with Code of Civil Procedure section 1008. Second, petitioner failed to establish that a blanket privilege for penitent-clergy communications applied to every document sought, many of which may well have contained completely nonprivileged information from reporting parties such as victims or parents of victims. Third, in light of the apparent concession that

petitioner's repository of documents has been electronically scanned and is 'searchable,' the claims of burden and harassment (which were tardily made) are not persuasive."

        8.      *PETITION FOR REVIEW*

Watchtower petitioned the Supreme Court for review of this court's August 1 order denying the writ petition. On September 24, the Supreme Court denied Watchtower's petition.

        E.      <u>MOTION FOR SANCTIONS</u>

        1.      *MOTION*

On November 17, 2014, J.W. filed a motion for terminating sanctions. J.W. argued that she served her request for production of documents on September 25, 2013, and despite court orders, Watchtower had not produced the 1997 Documents over one year after being served. J.W. explained that after the appellate process, on September 29, 2014, she wrote to Watchtower seeking production of the 1997 Documents, but Watchtower did not respond. On October 22 and November 5, J.W. again sought to meet and confer regarding production of the 1997 Documents, but Watchtower did not respond.

J.W. asserted the 1997 Documents were necessary to proving her negligence-based causes of action, and for an anticipated claim for punitive damages.[3] J.W.

---

[3] "No claim for punitive or exemplary damages against a religious corporation . . . shall be included in a complaint or other pleading unless the court enters an order allowing an amended pleading that includes a claim for punitive or exemplary damages to be filed." (Code Civ. Proc., § 425.14.) A court may grant leave to file an amended pleading requesting punitive damages only upon an affidavit reflecting the plaintiff has

*[footnote continued on next page]*

16

contended monetary sanctions could not repair the damage caused by Watchtower's withholding of the 1997 Documents because J.W. needed the 1997 Documents to prove her case. J.W. asserted sanctions establishing liability and punitive damages would be insufficient because the jury awarding damages would not see the harmful documents. J.W. asserted that Watchtower's misuse of the discovery process caused it to forfeit its right to defend itself in the instant case. J.W. requested the trial court strike Watchtower's answer.

### 2. OPPOSITION

Watchtower opposed J.W.'s motion for sanctions. Watchtower asserted terminating sanctions were an extreme remedy that would deny Watchtower its right of due process. Watchtower contended the 1997 Documents were not relevant to J.W.'s case, and therefore, it would be improper to impose terminating sanctions for the failure to produce the 1997 Documents. Watchtower asserted J.W.'s case would fail on the merits because Simental was only a member of the congregation—he did not hold a higher position—and therefore, Watchtower bore no responsibility for his actions. As a result, Watchtower reasoned that terminating sanctions would place J.W. in a better position than she would have been in had the 1997 Documents been produced.

---

*[footnote continued from previous page]*
*[footnote continued from previous page]*
evidence, meeting the clear and convincing standard of proof, to establish punitive damages. (Code Civ. Proc., § 425.14.)

17

### 3. *REPLY*

J.W. filed a reply to Watchtower's opposition. J.W. asserted that Watchtower's arguments reflected it disagreed with the trial court's order compelling production of the 1997 Documents. J.W. contended that Watchtower's "egregious contempt" for the trial court's authority warranted the imposition of terminating sanctions.

J.W. argued the 1997 Documents were relevant to her case because they could establish duty and breach for her negligence-based causes of action, and they were relevant to her anticipated punitive damages claim. J.W. asserted that because the 1997 Documents were relevant to a large portion of her case, terminating sanctions would not result in a windfall to J.W.

### 4. *HEARING*

On January 26, 2015, the trial court, in particular Judge Marquez, held a hearing on J.W.'s motion for sanctions. The trial court said its tentative ruling was to give Watchtower until January 30 to produce the 1997 Documents, and if the 1997 Documents were not produced, then the court would consider striking Watchtower's answer. The trial court explained that it did not want further argument about the relevance of the 1997 Documents because that issue had already been litigated. The court explained that the 1997 Documents needed to be produced by January 30.

Watchtower asserted that there was not a motion to compel pending and therefore the trial court could not order Watchtower to produce the 1997 Documents by January 30. The trial court explained that it was continuing the sanctions hearing to allow Watchtower time to comply with the February 11, 2014, order. Watchtower

18

asserted that if the trial court was continuing the hearing, then Watchtower would appear on January 30 to argue the issue of sanctions. The trial court responded, "I see. So you don't want to—your intent is not to turn over or produce the files that were ordered on February 11; is that correct?"

Watchtower responded that it would argue the issue of sanctions, in particular, it would explain how the 1997 Documents do not relate to the merits of J.W.'s case. The trial court said, "So you want to argue the issue of the relevancy that has already been litigated . . . before Judge Peters[o]n, which was then taken up to the District Court of Appeal, and then to the Supreme Court? You'd like to argue that once more in this court?" Watchtower explained that sanctions should relate to the harm that J.W. would suffer, and the withholding of the 1997 Documents would not cause harm to the merits of J.W.'s case—the 1997 Documents could only be relevant to an anticipated claim of punitive damages.

The trial court said, "Well, the Court's tentative is that it is going to grant the motion and will strike the answer if the—the information that has been ordered to be produced is not produced. [¶] The Court wanted to give you one last opportunity to comply before exercising that type of a sanction." Watchtower argued it would be inappropriate to strike its answer when the 1997 Documents only relate to punitive damages. The trial court asked, "Have you not had that opportunity to argue that before Judge Peters[o]n, before the DCA, and before the Supreme Court?" Watchtower asserted those prior arguments concerned the motion to compel, i.e., whether the 1997

Documents needed to be produced, while the current argument concerned potential harm to J.W. due to Watchtower's failure to produce the 1997 Documents.

The trial court asked, "So you're arguing instead the degree of the sanction? You're agreeing that there is an order[,] that it has not been complied with, but that the sanction is improper?" Watchtower responded, "Correct." The trial court explained, "There was no briefing on the issue of issue[s] sanctions. Watchtower is included as a defendant on all six causes of action. And the issue of the [1997 Documents] clearly has been found to be relevant to—to the issue of negligence, which would pertain to the first, second, third, and fourth causes of action. [¶] However, on the issue of the intentional torts and having to do with sexual battery and intentional infliction of emotional distress, that's where the Court has its concerns, and that wasn't briefed by either party. And so I don't know that the issue of the [1997 Documents] has to do with [causes of action] five and six."

Watchtower responded, "I would argue that it does not pertain to the liability in [the] first phase of this trial at all." The trial court said, "That's already been litigated, and that has already been ordered to be produced." Watchtower argued the 1997 Documents would not be introduced in the liability phase of trial because "these documents have nothing to do with this victim and that perpetrator." The court said, "That argument has been made throughout the litigation." Watchtower asserted any sanctions should only relate to the punitive damages phase of the litigation.

J.W. said that if the trial court's tentative ruling was to grant terminating sanctions for the negligence causes of action, then J.W. would dismiss her intentional

tort causes of action. Watchtower argued that if only the negligence causes of action remained, then the 1997 Documents had no relevance to the case, and there should be no sanctions. J.W. asserted the 1997 Documents were relevant to the negligence causes of actions. The trial court granted J.W.'s motion to dismiss her two intentional tort causes of action. The court took the issue of sanctions under submission.

### 5.    *RULING*

On February 2, 2015, the trial court issued its ruling on J.W.'s motion for terminating sanctions. The trial court found Watchtower willfully violated the court's February 11, 2014, order by refusing to produce the 1997 Documents, which were relevant to J.W.'s four negligence-based causes of action. The trial court explained that the 1997 Documents were relevant to the issue of duty, in particular J.W.'s allegation that Watchtower failed to reasonably investigate Simental and failed to warn J.W. The trial court explained that Watchtower had exhausted its appellate remedies concerning the February 11 order, but still refused to produce the 1997 Documents.

The trial court wrote, "At the January 26, 2015 hearing . . . , the Court attempted to give Watchtower another opportunity to produce these documents before ruling on the motion. However, Watchtower rejected this additional opportunity and refused to produce the outstanding documents. Watchtower does not deny that the documents at issue are responsive to the February 11, 2014 court order or that it has been ordered to produce these documents. Based on Watchtower's refusal to produce these documents—despite looming terminating sanctions that would strike Watchtower's Answer—the imposition of lesser sanctions (like monetary sanctions) is insufficient to

21

obtain compliance." The trial court granted J.W.'s motion for terminating sanctions and ordered Watchtower's answer be stricken.

### 6. *DEFAULT*

J.W. requested entry of Watchtower's default. The trial court clerk entered the default on March 23, 2015.

### F. MOTION FOR RELIEF

### 1. *MOTION*

On July 7, 2015, Watchtower filed a motion for relief from the order granting terminating sanctions. Watchtower asserted that, in February 2015 it was unable to produce the 1997 Documents because running computer searches for relevant documents caused the computer system to crash. Watchtower contended that its inability to comply with the court's order entitled it to relief under a theory of extrinsic mistake. Watchtower explained that, in March 2015 it developed software that allowed searches to be successfully conducted without the computer crashing.

Watchtower wrote that it "has a satisfactory excuse for not presenting a defense previously; it did not know how to electronically search for and identify the responsive documents." Watchtower contended it had a meritorious defense to J.W.'s lawsuit, in that Watchtower bore no responsibility for Simental, Watchtower had no knowledge of a threat posed by Simental, and the molestation did not occur at a congregation event.

### 2. *OPPOSITION*

J.W. opposed Watchtower's motion for relief. J.W. asserted that Watchtower failed to explain what mistake it had made, so as to justify a motion for relief. (Code

Civ. Proc., § 473, subd. (b).) J.W. argued that if Watchtower experienced technical difficulties in complying with the trial court's order, then it should have informed the court of those difficulties when the trial court announced its tentative ruling. Further, J.W. argued that Watchtower's motion was untimely because it was not brought in a reasonable amount of time due to the software being developed in March, and the motion being brought in July.

### 3. *RESPONSE*

Watchtower responded to J.W.'s opposition. Watchtower asserted its inability to produce the 1997 Documents was an extrinsic mistake that caused it to be unable to comply with the court's order. Watchtower asserted that it would have produced the 1997 Documents if it had been able to do so, and it was producing the 1997 Documents in another case. Watchtower explained that it did not inform the court, in January 2015 of its technical difficulties because it did not know that, in March 2015 it would successfully develop a program to search the 1997 Documents. Watchtower explained that because it did not know the technical issues would be resolved, it chose to confine its January arguments to the issue of the 1997 Documents being irrelevant.

### 4. *HEARING*

On July 29 and August 5, the trial court, again Judge Marquez, held hearings on Watchtower's motion. The trial court's tentative ruling was to deny Watchtower's motion due to Watchtower lacking standing, due to being in default. The trial court held a second hearing to permit the parties to discuss a recently published Supreme Court case.

Watchtower explained that while the software was developed in March, portions of the 1997 Documents were produced for the first time in May, in a San Diego County case. The trial court asked why the computer difficulties were not mentioned in January. Watchtower explained that it would not have been able to comply with the court's order by January 30, so it did not argue the computer issue.

J.W. argued that Watchtower was in default and therefore lacked standing to move for relief from the terminating sanctions. J.W. explained that Watchtower needed to seek relief from the default in order to have standing. Watchtower explained that it did not have grounds to seek relief from the default.

The trial court explained that Watchtower's motion was, in substance, a motion for reconsideration of the motion for terminating sanctions based upon new evidence. The trial court explained that such a motion is required to be brought within 10 days. Watchtower explained that it was seeking equitable relief based upon extrinsic mistake. The trial court asked if Watchtower was making a strategic decision to reopen the instant case due to the 1997 Documents having been disclosed in the San Diego County case. Watchtower explained it returned to court because its software was functioning properly.

The trial court concluded Watchtower lacked standing to seek relief because it was in default. Further, the court concluded Watchtower's motion was an untimely motion for reconsideration of the sanctions motion, and that Watchtower did not argue new facts because the computer problems were known to Watchtower in January 2015. To the extent the motion was a motion for relief, the trial court found Watchtower failed

24

to prove mistake, surprise, or excusable neglect because Watchtower knew of the computer problems in May 2014 and thus could have raised them in January 2015. The trial court concluded there was not a satisfactory explanation for Watchtower's failure to raise the computer issue in January 2015.

In regard to equitable relief, the trial court found Watchtower failed to prove extrinsic fraud or mistake related to its failure to raise the computer issue in January 2015. The trial court found Watchtower's refusal to comply with the court's "February 11, 2014 order was tactical and strategic in nature," and constituted "willful defiance of the Court['s] orders." The court explained that Watchtower's motion for relief was brought only after Watchtower produced the 1997 Documents in a San Diego County case. The trial court denied Watchtower's motion.

G.      DAMAGES

The trial court held a default prove-up hearing on the issue of damages. The trial court considered exhibits that were submitted. The trial court awarded J.W. $3,000,000 for pain and suffering; $1,000,000 for future medical expenses; and $16,152.39 for costs. The trial court entered judgment in favor of J.W. in the amount of $4,016,152.39.

**DISCUSSION**

A.      PROXIMATE CAUSE

Watchtower contends J.W. failed to allege proximate cause in her FAC.

"On an appeal from a default judgment an objection that the complaint failed to state facts sufficient to constitute a cause of action may be considered." (*Gore v. Witt* (1957) 149 Cal.App.2d 681, 686.) We apply the de novo standard of review when

25

considering whether a complaint alleges sufficient facts to state a cause of action, such facts being assumed true for this purpose. (*Lee v. Hanley* (2015) 61 Cal.4th 1225, 1230.)

Our Supreme Court has "recognized that proximate cause has two aspects. ' "One is cause in fact. An act is a cause in fact if it is a necessary antecedent of an event. "' [Citation.] This is sometimes referred to as 'but-for' causation.

"The second aspect of proximate cause 'focuses on public policy considerations. Because the purported [factual] causes of an event may be traced back to the dawn of humanity, the law has imposed additional "limitations on liability other than simple causality." [Citation.] "These additional limitations are related not only to the degree of connection between the conduct and the injury, but also with public policy." [Citation.] Thus, "proximate cause 'is ordinarily concerned, not with the fact of causation, but with the various considerations of policy that limit an actor's responsibility for the consequences of his conduct.' " [Citation.]' As Witkin puts it, '[t]he doctrine of proximate cause limits liability; i.e., in certain situations where the defendant's conduct is an actual cause of the harm, the defendant will nevertheless be absolved because of the manner in which the injury occurred . . . . Rules of legal cause . . . operate to relieve the defendant whose conduct is a cause in fact of the injury, where it would be considered unjust to hold him or her legally responsible.'

" 'Ordinarily, proximate cause is a question of fact which cannot be decided as a matter of law from the allegations of a complaint . . . . Nevertheless, where the facts are such that the only reasonable conclusion is an absence of causation, the question is one

of law, not of fact.' " (*State Dept. of State Hospitals v. Superior Court* (2015) 61 Cal.4th 339, 352-353.)

We begin with the first factor—cause in fact. In the FAC, J.W. alleged the Jehovah's Witness Church is hierarchical in nature: authority begins with Watchtower and flows down to the congregations. J.W. alleged that Simental was an elder in a congregation prior to joining the Mountain View congregation, and then upon joining the Mountain View congregation he was made an elder of that congregation. J.W. alleged, "Without the access to [J.W.] created by [Simental's] position with [Watchtower] as a Baptized Publisher, Ministerial Servant and Elder, [Simental] could not have sexually molested [J.W.]"

In the FAC, J.W. has alleged that it was Simental's position of authority within the church that created the opportunity for him to molest her. A reasonable inference from this allegation is that J.W. met Simental due to his position within the church, and her parents felt J.W. was safe in Simental's care because he held a position of authority in the church. Thus, Simental's position as an elder in the church was a necessary antecedent of the molestation. (See *Liberty Surplus Ins. Corp. v. Ledesma & Meyer Construction Co.* (2018) 5 Cal.5th 216, 225 (*Liberty*) [employer's "acts must be considered the starting point of the series of events leading to Doe's molestation"].) J.W. sufficiently alleged that Watchtower was responsible for Simental being in a position of authority within the church by alleging that Watchtower is the ultimate authority in the Jehovah's Witness Church.

27

We now turn to legal causation.  In California, an employer may be liable to a third party for negligently hiring or retaining an unfit employee.  (*Evan F. v. Hughson United Methodist Church* (1992) 8 Cal.App.4th 828, 836.)  Negligent hiring/retention is a theory of direct liability—not vicarious liability.  In a negligent hiring/retention cause of action, the neglect alleged is not that of the employee.  The neglect pleaded is that of the employer itself.  (*Fernelius v. Pierce* (1943) 22 Cal.2d 226, 233.)

An employer may be negligent because it has reason to know the employee, because of his qualities, " ' "is likely to harm others in view of the work or instrumentalities entrusted to him.  If the dangerous quality of the [employee] causes harm, the [employer] may be liable under the rule that one initiating conduct having an undue tendency to cause harm is liable therefor. . . .  [¶] . . . An [employee] . . . may be incompetent because of his reckless or vicious disposition, and if [an employer], without exercising due care in selection, employs a vicious person to do an act which necessarily brings him in contact with others while in the performance of a duty, he is subject to liability for harm caused by the vicious propensity. . . .  [¶] One who employs another to act for him is not liable . . . merely because the one employed is incompetent, vicious, or careless.  If liability results it is because, under the circumstances, the employer has not taken the care which a prudent man would take in selecting the person for the business in hand. . . .  [¶] Liability results . . . not because of the relation of the parties *but because the employer antecedently had reason to believe that an undue risk of harm would exist because of the employment*" ' " (*Federico v. Superior Court* (*Jenry G.*) (1997) 59 Cal.App.4th 1207, 1213-1214.)

We examine whether J.W. sufficiently alleged that Watchtower had reason to know of the threat of pedophilia posed by Simental. J.W. alleged, "Watchtower . . . knew or reasonably should have known of [Simental's] dangerous and exploitive propensities and/or that [Simental] was an unfit agent. Despite such knowledge, [Watchtower] negligently failed to supervise [Simental] in the position of trust and authority as a Jehovah's Witness . . . Elder, religious instructor, counselor, surrogate parent . . . , where he was able to commit the wrong acts against [J.W.]"

J.W. alleged that Watchtower knew of the threat of pedophilia posed by Simental, yet Watchtower permitted Simental to hold a position of authority that placed him in the company of children. Because J.W. has alleged that Watchtower had knowledge of the threat posed by Simental, she has sufficiently pled facts from which Watchtower could be held legally responsible for the molestation. (See *Mark K. v. Roman Catholic Archbishop of Los Angeles* (2003) 67 Cal.App.4th 603, 611-612 [the liability of a church may be found where the church had reason to be suspicious of a priest's propensity for pedophilia].) In sum, J.W. has sufficiently pled proximate cause.

Watchtower contends proximate cause was not sufficiently pled because J.W. did not allege that the slumber party was a church sponsored activity. Under a theory of negligent hiring, an employer is held responsible for its hiring decision. This is a theory of direct liability. (*Z.V. v. County of Riverside* (2015) 238 Cal.App.4th 889, 902.) It differs from respondeat superior, which is a theory of vicarious liability. Under a theory of respondeat superior, the employee must have been acting within the scope of his employment at the time of the wrongdoing, and then the employer is held liable for the

29

employee's bad act.[4] (*Juarez v. Boy Scouts of America, Inc.* (2000) 81 Cal.App.4th 377, 393-394.)

Thus, under a negligent hiring/retention theory, the issue is not whether the employee was acting within the scope of his employment, but whether the employer acted properly in hiring or retaining the employee. As a result, a failure to plead that the party was a church sponsored event does not mean causation could not be found by a trier of fact. In a negligent hiring/retention analysis, the focus is on Watchtower's actions in hiring/retaining Simental, i.e, the risk of molestation that Watchtower allegedly knowingly created. Accordingly, we are not persuaded that proximate cause was improperly pled due to a failure to allege that the party was a church sponsored event. (See e.g., *Liberty*, *supra*, 5 Cal.5th at p. 225 ["a finder of fact could conclude that the causal connection between [the employer's] alleged negligence and the injury inflicted by [the employee] was close enough to justify the imposition of liability on [the employer]. . . . [The employer's] acts must be considered the starting point of the series of events leading to Doe's molestation"].)

Watchtower asserts this court would be contradicting the Restatement of Agency by holding that J.W. adequately pled proximate cause. The Restatement provides, "A principal who conducts an activity through an agent is subject to liability for harm to a third party caused by the agent's conduct if the harm was caused by the principal's

---

[4] "[W]e are not aware of any California decision that has held a religious institution liable under the theory of respondeat superior for the acts of institution personnel in molesting parishioners." (*Evan F. v. Hughson United Methodist Church*, *supra*, 8 Cal.App.4th at p. 840, fn. 2.)

30

negligence in selecting, training, retaining, supervising, or otherwise controlling the agent." (Rest.3d Agency, § 7.05, p. 177.) A comment in the Restatement explains, "[W]hen the actor's tort occurs in the course of an extramural activity unrelated to the actor's employment, the tort may lack a sufficient causal relationship to the actor's employment." (Rest.3d Agency, § 7.05, com. c.)

The Restatement reflects causation *may* not be present when the harm occurs outside the work environment. It does not reflect that causation *cannot* be found when the harm occurs outside the work environment. Because causation may be found when the harm occurs outside the work environment, we are not persuaded that our conclusion—that J.W. adequately pled proximate cause—contradicts the Restatement.

Watchtower asserts that our conclusion in this case—that proximate cause was adequately pled in the FAC—will open the litigation floodgates. As set forth *ante*, proximate cause issues are typically questions of fact. (*State Dept. of State Hospitals v. Superior Court*, *supra*, 61 Cal.4th at pp. 352-353.) Our conclusion is limited to the facts pled in J.W.'s FAC. Whether proximate cause is adequately pled in future cases will need to be decided on a case-by-case basis. (See *Liberty*, *supra*, 5 Cal.5th at p. 223 ["California cases expressly recogniz[e] that negligent hiring, retention, or supervision may be a substantial factor in a sexual molestation perpetrated by an employee, depending on the facts presented"].) Accordingly, we are not persuaded that our conclusion will open the litigation floodgates.

Watchtower contends proximate cause was not sufficiently pled because Watchtower relinquished control over congregational affairs to the CCJW. In J.W.'s

31

FAC, she alleged, "While supervised, directed and controlled by Defendants Mountain View, French Valley, Watchtower and CCJW, Gilbert Siment[a]l committed the acts of childhood sexual abuse alleged herein." Thus, J.W.'s allegations reflect that Watchtower was responsible for supervising Simental at the time of the molestation.

Watchtower contends proximate cause was not sufficiently pled because J.W.'s allegation that Simental was appointed and confirmed as an elder was alleged on information and belief. Watchtower contends the allegation is not well pled because J.W. failed to allege facts supporting the basis for her belief that Simental served as an elder.

When analyzing the sufficiency of a complaint, we treat all properly pled facts as true. (*Zelig v. County of Los Angeles* (2002) 27 Cal.4th 1112, 1126.) A "[p]laintiff may allege on information and belief any matters that are not within [her] personal knowledge, if [s]he has information leading [her] to believe that the allegations are true." (*Pridnoff v. Balokovich* (1951) 36 Cal.2d 788, 792.)

J.W. alleged that she has belonged to Jehovah's Witness congregations from birth until after she was molested. J.W. and Simental belonged to the Mountain View congregation "and regularly attended Jehovah's Witness meetings sponsored by that congregation. [¶] . . . [J.W.] and her parents attended the same meetings at the same Kingdom Hall as [Simental] twice per week." It can reasonably be inferred from J.W.'s allegations that her belief that Simental was an elder was based upon her participation in the same congregation as Simental. Accordingly, we are not persuaded that J.W. failed to properly plead proximate cause against Watchtower.

B.    DUE PROCESS

Watchtower contends the trial court violated Watchtower's right of due process

by striking Watchtower's answer due to a failure to comply with the February 11, 2014,

order because the February 11, 2014, order was not in writing.[5]

We apply the de novo standard of review.  (*Bostean v. Los Angeles Unified

School District* (1998) 63 Cal.App.4th 95, 107.)  Due process requires adequate notice

be provided prior to the imposition of sanctions.  (*Caldwell v. Samuel Jewelers* (1990)

222 Cal.App.3d 970, 976.)  Watchtower is asserting the lack of a written order

compelling further discovery (on February 11, 2014) led to confusion about the required

discovery and thus, Watchtower lacked notice of what was required and therefore the

terminating sanctions were improper.

The trial court's February 11, 2014, minute order reads, "Motion is granted and

denied in part[.]  Ruling as stated on the record."  At the hearing on the motion for

terminating sanctions, Watchtower did not express confusion regarding the February 11,

---

[5] In general, a defendant's default admits the truth of the allegations in the plaintiff's complaint.  (*Steven M. Garber & Associates v. Eskandarian* (2007) 150 Cal.App.4th 813, 823.)  As a result, if "the defaulting party takes no steps in the trial court to set aside the default judgment, appeal from the default judgment presents for review only the questions of jurisdiction and the sufficiency of the pleadings."  (*Corona v. Lundigan* (1984) 158 Cal.App.3d 764, 766-767; *Butenschoen v. Flaker* (2017) 16 Cal.App.5th Supp. 10, 13.)  However, an order granting terminating sanctions is not appealable, so the losing party must ordinarily await entry of a judgment of dismissal to seek review.  (*Mileikowsky v. Tenet Healthsystem* (2005) 128 Cal.App.4th 262, 264; Code Civ. Proc., § 904.1, subd. (b).)
Watchtower is appealing from a default judgment.  However, it did not have an opportunity to appeal from the order granting terminating sanctions and striking its answer.  Because the issue raised is procedural, and this is Watchtower's first opportunity to raise the issue for appellate review, we will address the issue.

2014, order compelling further discovery. At the sanctions hearing, the trial court asked, "You're agreeing that there is an order[,] that it has not been complied with, but that the sanction is improper?" Watchtower responded, "Correct." It appears from Watchtower's response that it understood the February 11, 2014, minute order because Watchtower agreed there was an order and agreed it had not complied with the order— Watchtower did not argue it was confused or that the February 11 minute order should be interpreted in a different manner. Moreover, in March 2014 Watchtower filed a motion to set aside the trial court's order compelling production in response to RFP 66, which indicates Watchtower understood the court ordered Watchtower to produce the 1997 Documents. Accordingly, because Watchtower understood that it was ordered to produce the 1997 Documents, we conclude its right of due process was not violated.

Watchtower contends its right of due process was violated because, on February 11, 2014, Judge Peterson did not rule on Watchtower's objections to RFP 66. Watchtower's objections were presented in J.W.'s separate statement. The separate statement provided that Watchtower objected to RFP 66 based upon (1) the minister-communicant privilege; (2) invasion of privacy; (3) the request not leading to admissible evidence; and (4) the request being overbroad. Further, Watchtower asserted that it did not have any documents predating July 15, 2006, concerning Simental, which were sent in response to the March 14, 1997, letter.

When Judge Peterson began the February 11 hearing, he said in regard to all of Watchtower's objections to all of the requests for production, "[Watchtower] object[s] on the following grounds: Number one, penitent/clergy privilege, attorney/client

34

privilege, attorney work product, privacy, and in several instances, the time period which would cover the documents sought to be received."

The court continued, "Turning to the issue of privacy, [Watchtower] cite[s] no authority that there is a privacy right in this case. However, even if there is one, disclosure of information relating to sexual predators of children outweigh any privacy. That comes from the clergy cases. [¶] Objection to the time period. The defendants want to stop discovery at the time of the slumber party, however [J.W.'s] response overcomes this argument. [¶] . . . [¶] As to the penitent/clergy privilege, first of all, [J.W.] argues collateral estoppel. The Court does not accept that argument . . . . [¶] . . . [Watchtower] herein argue[s] that . . . just because the information is shared by a congregation of elders should not take them out of the privilege. However, the *Roman Catholic Archbishop of Los Angeles* case clearly states and holds that when the communication is shared, the privilege is waived. . . . The court has also reviewed the attorney/client and attorney work product issues."

The trial court grouped all of the similar objections together for the various requests for production, but the trial court did address the different objections. The trial court's comments reflect it read the objections, the responses, and the law relevant to the objections. Accordingly, we are not persuaded that the trial court failed to rule on Watchtower's objections.

Watchtower contends Judge Peterson's ruling on February 11, 2014, only pertained to Request for Production No. 2—he did not rule upon RFP 66. At the end of the February 11 hearing, J.W.'s attorney said, "There were a number of requests that

35

were separate and apart from the identified documents that we were discussing. . . . For instance, [J.W.] sought the production of various iterations of the Jehovah's Witness Handbook to be produced as well as several letters." Counsel continued, "So there's been no ruling with respect to those. And the ones that are significant would be the elder handbooks." The trial court responded, "Well, excuse me, [counsel]. [¶] My ruling as to the objections and stating that all remaining items—the request for all remaining items is granted, would that not include all those documents, the books?"

Counsel said, "So the ruling said that all the materials that were not specified as being privileged are to be produced." The trial court replied, "Certainly, and I apologize if I wasn't clear." The trial court's comments reflect that it considered the objections to all of the items and that its ruling was meant to apply to all of J.W.'s requests for production—it was not limited to Request for Production No. 2. Accordingly, we conclude the trial court did not violate Watchtower's right of due process.

### C.    TERMINATING SANCTIONS

Watchtower contends the trial court erred by imposing terminating sanctions because it was too severe of a sanction.

"California discovery law authorizes a range of penalties for a party's refusal to obey a discovery order, including monetary sanctions, evidentiary sanctions, issue sanctions, and terminating sanctions. [Citations.] A court has broad discretion in selecting the appropriate penalty, and we must uphold the court's determination absent

36

an abuse of discretion. [Citation.] We defer to the court's credibility decisions and draw all reasonable inferences in support of the court's ruling.

"Despite this broad discretion, the courts have long recognized that the terminating sanction is a drastic penalty and should be used sparingly. [Citation.] A trial court must be cautious when imposing a terminating sanction because the sanction eliminates a party's fundamental right to a trial, thus implicating due process rights. [Citation.] The trial court should select a sanction that is ' " 'tailor[ed] . . . to the harm caused by the withheld discovery.' " ' [Citation.] ' "[S]anctions 'should be appropriate to the dereliction, and should not exceed that which is required to protect the interests of the party entitled to but denied discovery.' " '

"The discovery statutes thus 'evince an incremental approach to discovery sanctions, starting with monetary sanctions and ending with the ultimate sanction of termination.' [Citation.] Although in extreme cases a court has the authority to order a terminating sanction as a first measure [citation], a terminating sanction should generally not be imposed until the court has attempted less severe alternatives and found them to be unsuccessful and/or the record clearly shows lesser sanctions would be ineffective." (*Lopez v. Watchtower Bible and Tract Society of New York, Inc.* (2016) 246 Cal.App.4th 566, 604-605.)

Watchtower contends the trial court should have imposed an issue sanction concerning the element of duty. In particular, Watchtower asserts the trial court should have sanctioned Watchtower by forbidding Watchtower from arguing it did not owe a duty to J.W. Watchtower did not raise this duty-focused argument in the trial court.

At the hearing on J.W.'s request for terminating sanctions, Watchtower argued that the withholding of the 1997 Documents would not cause harm to the merits of J.W.'s case in the liability phase of trial; Watchtower asserted the 1997 Documents could only be relevant to an anticipated claim of punitive damages. Watchtower asserted any sanctions should only relate to the punitive damages phase of the litigation. Meanwhile, J.W. asserted the 1997 Documents could be relevant to duty, breach, and an anticipated claim of punitive damages. J.W. requested terminating sanctions.

We cannot conclude the trial court abused its discretion by failing to enter an order that was never suggested. (See *Colony Ins. Co. v. Crusader Ins. Co.* (2010) 188 Cal.App.4th 743, 750-751 [argument is forfeited due to failure to raise it in the trial court].) Neither Watchtower nor J.W. argued for an issue sanction on the element of duty. Therefore, the trial court did not abuse its discretion by not ordering a duty-focused issue sanction.

Watchtower contends that when J.W. dismissed her intentional tort causes of action, the trial court should have used that opportunity to consider imposing lesser sanctions. When J.W. offered to dismiss her intentional tort causes of action for the sake of obtaining terminating sanctions on her negligence-based causes of action, Watchtower argued that if only the negligence causes of action were to remain, then the 1997 Documents had no relevance to the case, and there should be no sanctions. Because Watchtower did not seek lesser sanctions when the intentional torts were dismissed, we cannot fault the trial court for failing to order such lesser sanctions. (See

*Colony Ins. Co. v. Crusader Ins. Co.*, *supra*, 188 Cal.App.4th at pp. 750-751 [argument is forfeited due to failure to raise it in the trial court].)

Watchtower contends the trial court erred in its finding that lesser sanctions would be ineffective. In its written ruling, the trial court wrote, "Based on Watchtower's refusal to produce these documents—despite looming terminating sanctions that would strike Watchtower's Answer—the imposition of lesser sanctions (like monetary sanctions) is insufficient to obtain compliance." The trial court said its tentative opinion was to grant terminating sanctions, but it gave Watchtower four days to start producing the 1997 Documents. Watchtower did not produce the 1997 Documents. Given that the prospect of terminating sanctions did not motivate Watchtower to comply with the court's discovery order, it is logical to conclude that lesser sanctions would have been ineffective in motivating Watchtower to comply. Accordingly, we conclude the trial court's reasoning is sound.

Watchtower contends the trial court's reasoning is erroneous because "a responding party facing terminating sanctions would *always* forfeit consideration of a lesser sanction by the mere fact that it has not complied." This case does not present the situation that Watchtower seems to describe in which a party does not comply and terminating sanctions are immediately ordered. The key here is the court's warning that terminating sanctions would likely be granted, and the multi-day opportunity for Watchtower to comply once notified of that possibility. The trial court gave Watchtower notice that it would likely grant terminating sanctions after a four-day period if Watchtower did not start producing the 1997 Documents, and Watchtower,

despite that warning, did not comply with the court's nearly year-old discovery order. Thus, with that particular procedural history, it was reasonable to conclude that lesser sanctions would be ineffective in motivating Watchtower to comply with the court's discovery order. (See *Mileikowsky v. Tenet Healthsystem*, *supra*, 128 Cal.App.4th at pp. 279-280 ["where a violation is willful, preceded by a history of abuse and the evidence shows that less severe sanctions would not produce compliance with the discovery rules, the trial court is justified in imposing the ultimate sanction"].)

D.     <u>MOTION FOR RECONSIDERATION</u>

Watchtower contends the trial court erred by denying Watchtower's motion to set aside the order granting terminating sanctions.

Code of Civil Procedure section 1008 governs motions for reconsideration of prior orders. It provides that "any party affected by the order may, within 10 days after service upon the party of written notice of entry of the order and based upon new or different facts, circumstances, or law, make application to the same judge or court that made the order, to reconsider the matter and modify, amend, or revoke the prior order." (Code Civ. Proc., § 1008, subd. (a).) "The name of a motion is not controlling, and, regardless of the name, a motion asking the trial court to decide the same matter previously ruled on is a motion for reconsideration under Code of Civil Procedure section 1008." (*Powell v. County of Orange* (2011) 197 Cal.App.4th 1573, 1577.)

The trial court granted terminating sanctions on February 2, 2015. Watchtower moved for relief on July 7. In the motion, Watchtower argued that the order granting terminating sanctions should be reconsidered because Watchtower gained the technical

ability to comply with the trial court's discovery order. Watchtower's motion, in substance, was a motion for reconsideration based upon new circumstances. The new circumstances consisted of Watchtower's newly acquired ability to search the 1997 Documents. Therefore, the motion had to be brought within 10 days of February 2. Watchtower's motion was not brought within 10 days of February 2, and therefore was untimely. As a result, the trial court did not err by denying Watchtower's motion.

Watchtower contends the trial court erred by concluding Watchtower lacked standing to bring the motion for reconsideration, due to Watchtower being in default. This court reviews the trial court's ruling, not its reasoning. (*Border Business Park, Inc. v. City of San Diego* (2006) 142 Cal.App.4th 1538, 1561.) As set forth *ante*, the trial court could properly deny Watchtower's motion due to it being untimely. Therefore, the trial court did not err.

Watchtower contends the trial court should have construed its motion as a motion for equitable relief from default. At the hearing on Watchtower's motion, the trial court asked, "[A]m I correct, that there has never been a motion to set aside the default?" Watchtower responded, "There has not been, your Honor. Because we didn't—we didn't have the grounds." Watchtower did not inform the trial court that it wanted its motion to be construed as a motion for relief from default. As a result, we cannot fault the trial court for not treating the motion for reconsideration of the terminating sanctions as a motion for relief from the default. (See *Colony Ins. Co. v. Crusader Ins. Co.*, *supra*, 188 Cal.App.4th at pp. 750-751 [argument is forfeited due to failure to raise it in the trial court].)

41

Watchtower contends its motion was based in equity and should have been granted due to Watchtower's excusable neglect. " 'Excusable neglect' is generally defined as an error ' " 'a reasonably prudent person under the same or similar circumstances might have made.' " ' " (*Ambrose v. Michelin North America, Inc.* (2005) 134 Cal.App.4th 1350, 1354.)

In Watchtower's motion, it explains that terminating sanctions were granted on February 2, 2015, and, at the end of March 2015 Watchtower developed the ability to search the 1997 Documents. Watchtower continued, "Accordingly, being now able to produce the documents ordered by this Court, Watchtower is offering to do so on a rolling basis as it is doing in [a San Diego County case]." Watchtower has not explained a mistake or error that occurred prior to February 2. Rather, Watchtower has set forth a change in circumstance. The new circumstance is that Watchtower gained the ability to search the 1997 Documents. A change in circumstance does not equate with a mistake or error. Accordingly, to the extent Watchtower's motion could be construed as seeking equitable relief, the trial court did not abuse its discretion in denying the motion because excusable neglect was not shown. In sum, the trial court did not err.

E.     REQUESTS FOR JUDICIAL NOTICE

J.W. requests we take judicial notice of various documents. Watchtower opposes the request. First, J.W. requests we take judicial notice of an appellant's opening brief received by the California Court of Appeal Fourth District, Division One in *Padron v. Watchtower Bible and Tract Society of New York, Inc.* (D070723). The brief is marked

42

as received by the appellate court; it is not marked as filed.  J.W.'s counsel declares the brief is a true and correct copy of the brief filed by the court.  The brief filed by the court would bear a file stamp, unlike the brief provided in this request that is marked as received by the court.  Accordingly, it does not appear to be a conformed copy.  (*Wolf v. CDS Devco* (2010) 185 Cal.App.4th 903, 914-915 [requesting party bears the burden of providing a conformed copy or explaining why a conformed copy is unavailable].)  Because the brief is not marked as filed by the court, we deny J.W.'s request that we take judicial notice of the brief.  (*Ibid.*; Evid. Code, § 452, subd. (d).)

Second, J.W. requests we take judicial notice of a discovery referee's recommendation in *Padron v. Doe 1* (San Diego County Superior Court case No. 37-2013-00067529-CU-PO-CTL).  The document does not bear a stamp reflecting it was filed by the court.  J.W.'s counsel declares the brief is a true and correct copy of the brief filed by the court.  The document filed by the court would bear a file stamp, which this document does not.  Therefore, it does not appear to be a conformed copy.  (*Wolf v. CDS Devco*, *supra*, 185 Cal.App.4th at pp. 914-915 [requesting party bears the burden of providing a conformed copy or explaining why a conformed copy is unavailable].)  Accordingly, we deny J.W.'s request that we take judicial notice of the referee's recommendations.  (*Ibid.*; Evid. Code, § 452, subd. (d).)

Third, J.W. requests we take judicial notice of two minute orders from *Padron v. Doe 1* (San Diego County Superior Court case No. 37-2013-00067529-CU-PO-CTL), and two minute orders from *Lopez v. Doe 1 Linda Vista Church* (San Diego County

43

Superior Court case No. 37-2012-00099849-CU-PO-CTL). We grant the request. (Evid. Code, §§ 452, subd. (d), 453.)

Watchtower contends the minute orders are irrelevant and therefore the request should be denied. We have not relied on the minute orders in our opinion, and we do not find the minute orders to be helpful in this case because, as Watchtower notes, the minute orders were not before the trial court in the instant case. (*People v. Preslie* (1977) 70 Cal.App.3d 486, 493 [denying judicial notice of documents not presented to the trial court].) However, J.W. relies upon the minute orders in making her argument to this court. For example, J.W. argues, "Watchtower is a repeat offender who has consistently flouted court orders to produce documents regarding its knowledge of child molestation . . . in multiple pending cases besides this case." Because the minute orders are relevant to J.W.'s argument, we conclude they have some relevance.

## DISPOSITION

The judgment is affirmed. Respondent is awarded her costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1).)

CERTIFIED FOR PUBLICATION

MILLER
J.

We concur:

McKINSTER
Acting P. J.

FIELDS
J.

44